**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

**ESTATE OF JOSE PABON-LUGO et al.,**

**Plaintiffs**

**v.**

**AMERICAN GENERAL LIFE INSURANCE CO. et al.,**

**Defendants.**

**CIVIL NO. 13-1463 (GAG)**

**CERTIFICATION TO THE PUERTO RICO SUPREME COURT**

This certification to the Honorable Puerto Rico Supreme Court involves an inquiry into Puerto Rico insurance law to determine whether a provision in an insurance contract that precludes the payment of death benefits to beneficiaries if the insured commits "suicide, sane or insane" applies if the insured could not understand and appreciate the physical nature and consequences of the act which resulted in his death. In other words, despite the inclusion of such a provision, must a trial court engage in an inquiry to determine if the insured actually entertained the intention of killing himself in determining whether an insurer is liable to pay death benefits?

**I. Procedural Background**

On June 13, 2010, Jose Pabón-Lugo ("Pabón-Lugo") died after shooting and killing his wife and then taking his own life. Following an autopsy and police investigation, the Institute of Forensic Sciences (Instituto de Ciencias Forenses) declared the cause of Pabón-Lugo's death a suicide. Pursuant to that finding and a provision in Pabón-Lugo's life insurance policies that provides that if he "commits suicide, while sane or insane, within two years of the Issue Date, we will pay only the amount of premiums paid to us," both Transamerica Life Insurance Company

("Transamerica") and ReliaStar Life Insurance Company ("ReliaStar") (collectively "Defendants") paid to Pabón-Lugo's beneficiaries death benefits in the amount of premiums received prior to Pabón-Lugo's death, as opposed to the full face values of the policies. Thereafter, the Estate of Jose Pabón-Lugo and its beneficiaries, Jose Pabón-Castrodad, Alejandro Pabón-Castrodad, Noemi Pabón-Lugo, Robert Hamilton Price, and Eva Marie Price (collectively "Plaintiffs"), filed this lawsuit invoking the court's diversity jurisdiction against American General Life Insurance, Transamerica, and ReliaStar, alleging breach of insurance contract, wrongful exclusion of death benefits, fraud, and negligence. (See Docket Nos. 1 and 51.) Plaintiffs claim that although Pabón-Lugo's death was deemed a suicide, this determination was made "without legal implication," and thus Defendants breached the insurance contracts by failing to pay the face value of the policies. (Docket No. 51.) In essence, Plaintiffs claim that Pabón-Lugo was so severely intoxicated when he shot himself that he could not have formed the intent necessary to commit suicide. Plaintiffs further asserted claims of fraud, unrelated to the enforcement of the suicide exclusion provision, and negligence based upon on the same facts as the breach of contract claim. (Docket Nos. 1 and 51.)

Defendants moved to dismiss the complaint and the court denied said motions, noting that although Defendants had made out a *prima facie* case of intentional suicide because Pabón-Lugo's death certificate states that the he intentionally inflicted harm upon himself with a firearm, the issue of whether Pabón-Lugo intentionally committed suicide must turn on evidence, which Plaintiffs have the right to rebut.[1] (See Docket Nos. 42 and 55.) As such, the court ordered

---

[1] "Once duly certified by the proper authority, a death certificate 'shall become prima facie evidence of the facts stated therein before any court of justice.' P.R. LAWS ANN. tit. 24, § 1237 (2002). See i.e., In re Hon. Gonzalez

discovery on the issue of Pabón-Lugo's suicide, destining that issue to be discussed at summary judgment. (Docket Nos. 42 and 55.) Thereafter, the court granted Plaintiffs' motion for dismissal of all claims against American General Life Insurance without prejudice. (Docket No. 77.)

On this same date, the court addressed both Transamerica's and ReliaStar's motions for summary judgment (Docket Nos. 146 and 147) and granted both motions with respect to Plaintiffs' fraud and negligence claims. (Docket No. 178.) However, because the resolution of Plaintiffs' breach of contract and wrongful exclusion of death benefits claim relies solely upon Puerto Rico law and no clear precedent on this issue exists, the court believed that the prudent course of action was to certify the issue to the Puerto Rico Supreme Court rather than attempting to predict a future ruling of that court. See P.R. LAWS ANN. tit 4 § 24s(f). Thus, the court has dispensed of all remaining issues in this case and the resolution of this contract law issue is all that remains before the court. See P.R. LAWS ANN. tit 4 § 25(a), 25(c).

## II. Relevant Factual Background

Approximately fifteen years ago, Pabón-Lugo began purchasing life insurance products from Maldonado and continued to buy such products from him until his death on June 13, 2010. (Docket Nos. 145 ¶ 3; 153 ¶ 3.) Maldonado was a licensed Insurance Producer by the Office of

---

Porrata–Doria, 158 D.P.R. 150, 159 (2002) (marriage certificate issued by the Registry of Vital Statistics is proof of the circumstances appearing in the certificate inasmuch as it constitutes prima facie evidence of the marriage pursuant to law). However, information contained in the pertinent Registry records is subject to challenge by way of adequate evidence. 'The proof of age as appears from the certificate issued by the Registry of Vital Statistics can be overcome by other evidence which may carry to the mind of the trier of facts the conviction that the date of birth of a person is other than that stated therein. Of course, said evidence must be weighed according to the credibility of the witnesses and the probatory value of the documents admitted.' Bigas v. Com. Industrial, 71 P.R.R. 313, 319-20 (1950). See also, Castro v. Negrón, 159 D.P.R. 568, 615 (2003) (information in recordings appearing in Registry of Vital Statistics constitute prima facie evidence which may be questioned through appropriate proof); Caraballo v. Sec'y of Health and Human Services, 670 F. Supp. 1106, 1107 ([D.P.R.] 1987) (proof of age in certificate 'can be overcome by other evidence which may carry to the mind of the trier of facts the conviction that the date of birth of a person is other than that stated therein.')." Moeller Tevez v. Allmerica Fin. Life Ins. & Annuity Co., 534 F. Supp. 2d 253, 258-59 (D.P.R. 2008).

the Commissioner of Insurance of Puerto Rico from 1980 until February, 2013. (Docket No. 145 ¶ 1.) In this capacity, the parties dispute whether Maldonado acted on behalf of the insurance companies of which he presented their products or whether he solely represented the prospective insured. (Docket Nos. 145 ¶ 2; 153 ¶ 2.) In 2009, Pabón-Lugo contacted Maldonado with an interest in replacing the three life insurance policies already issued to him by American General Life Insurance. (Docket No. 145 ¶ 4.) Thereafter, Pabón-Lugo and Maldonado met on several occasions to discuss alternative life insurance carriers and products to replace Pabón-Lugo's American General Life Insurance policies. (Docket No. 145 ¶ 5.) During one of those meetings, Maldonado recommended that Pabón-Lugo diversify his risk and use multiple insurance companies. (Docket No. 145 ¶ 7.) Those insurance companies included Transamerica and ReliaStar. (Docket Nos. 145 ¶ 8; 148 ¶ 3-4; 153 ¶ 8; 157 ¶ 3-4.)

Furthermore, during one of those meetings, pursuant to the applicable Puerto Rico Regulations, Maldonado provided Pabón-Lugo with all the requisite forms and information regarding the possible policy changes, including a written statement of all of the facts relevant to the change of policies, including a summary of the advantages and disadvantages of making the change. (Docket Nos. 145 ¶ 9; 148 ¶ 10.) Pabón-Lugo signed such written statements for both Transamerica and ReliaStar after reviewing them with Maldonado. (Docket Nos. 145 ¶ 9; 148 ¶ 5.) Prior to completing and signing the applications for the Transamerica and ReliaStar policies, Maldonado also discussed with Pabón-Lugo Transamerica's contestability provisions, including the two-year suicide provision. (Docket No. 145 ¶ 10.) This provision, which is included in both Transamerica's and ReliaStar's policies, provides that "[i]f the Insured commits suicide, while sane or insane, within two years of the Issue Date, we will pay only the amount of premiums paid

to us." (Docket Nos. 145 ¶¶ 10, 20; 148 ¶ 5; 157 ¶ 5.) After discussing the different insurance options with Maldonado, including their advantages and disadvantages, Pabón-Lugo cancelled his three American General Life Insurance policies and replaced them with a policy issued by Transamerica and a policy issued by ReliaStar. (Docket Nos. 145 ¶ 11.) Thereafter, Transamerica issued a life insurance policy to Pabón-Lugo on September 2, 2009 and ReliaStar issued a policy to Pabón-Lugo on February 18, 2009. (Docket Nos. 145 ¶ 19; 148 ¶ 5; 148-2 at 3; 153 ¶ 19; 157 ¶ 4.)

On June 13, 2010, Pabón-Lugo shot and killed his wife, Maribel Castrodad, and then shot and killed himself. (Docket Nos. 145 ¶ 21; 148 ¶ 11; 153 ¶ 21; 157 ¶ 11.) Pabón-Lugo's death occurred within two years of when Defendants' insurance policies were issued, which included the suicide provisions, and the Certified Death Certificate and Autopsy Report for Pabón-Lugo both identify his cause of death as a suicide. (Docket Nos. 145 ¶ 23-24; 148 ¶ 11; 153 ¶ 23-24; 157 ¶ 11.) The Autopsy Report indicates, however, that the term suicide is used "without implying its judicial acceptance." (Docket No. 152-3 at 5.) A toxicology report also revealed that Pabón-Lugo's blood alcohol content was .22 percent when the test was done. (Id. at 4.)

After Pabón-Lugo's death, Plaintiffs each submitted claim forms to Transamerica and ReliaStar with the assistance of Maldonado, in which they identified the cause of death as a "suicide." (Docket Nos. 145 ¶ 25; 148 ¶¶ 17-18; 153 ¶ 25; 157 ¶¶ 17-18.) Plaintiffs now claim that the use of the word "suicide" was not used with any legal implication. (Docket Nos. 145 ¶ 25; 157 ¶¶ 17-18.) Pursuant to the suicide clauses of each policy, both Transamerica and ReliaStar paid to the beneficiaries under the policies the premiums that had been paid on each policy prior to Pabón-Lugo's death. (Docket Nos. 145 ¶ 26; 148 ¶ 19; 153 ¶ 26; 157 ¶ 19.)

**III. Discussion**

Throughout the litigation of the case, Plaintiffs have never disputed the fact that Pabón-Lugo took his own life, by his own hand, after he shot and killed his wife. More so, Defendants have never disputed the fact that Pabón-Lugo was severely intoxicated when he took his own life. Where the parties disagree profusely is in passing upon the question of whether “suicide, sane or insane,” can be found where the insured, at the time he killed himself, was so insane so not to be able to appreciate or comprehend the physical nature and consequences of the destructive act.

To best understand the nature and implications of this case, the court will briefly discuss the history of provisions excluding death by suicide. Suicide exclusion clauses have long been written into life insurance policies. The reasoning behind such clauses is that suicide is an unpredictable risk that insurers do not want to incur. Indeed, in another context, the Puerto Rico Supreme court recognized the difficulty in foreseeing and preventing suicide. See Crespo v. H.R. Psychiatric Hosp., Inc., 114 D.P.R. 796, 14 P.R. Offic. Trans. 1027 (1983) (holding hospital did not incur malpractice liability for patient’s suicide). Numerous early cases across the United States held that self-destruction while insane was not suicide when a policy has a provision excluding or limiting an insurer’s liability when an insured dies from suicide because it was deemed that there could be no suicide unless the person committing the self-destructive act could form a conscious intention to kill himself and carry out that act, realizing both its moral and physical conditions and consequences. See Insurance: Construction of “sane or insane” provision of suicide exclusion, 9 A.L.R.3d 1015 (Originally published in 1966). In reaction to these holdings, insurers began to add to the words "sane or insane” to modify “suicide” in their exclusion clauses. Id. Many States’ legislatures have promoted the use of such clauses. For example, the Puerto Rico Insurance Code

allows for insurers of life insurance to limit their liability in the event of death occurring "[a]s a result of suicide of the insured, whether sane or insane, within two (2) years from date of issue of the policy." P.R. LAWS ANN. tit. 46 § 1360(1)(b).

In construing the sane or insane clause, courts across the country agree that death as the result of a simple or pure accident, even if the result of the insured's own act, is not within the scope of the clause because one cannot commit suicide by accident. See Insurance: Construction of "sane or insane" provision of suicide exclusion, 9 A.L.R.3d 1015 (Originally published in 1966). Further, courts also generally agree that the "sane or insane" modifier renders it unnecessary that the insured be able to appreciate the **moral character and quality of the self-destructive act** from which death results. See, e.g., Bigelow v. Berkshire Life Ins. Co., 93 U.S. 284, 287 (1876); Hart v. Modern Woodmen of Am., 57 P. 936, 937 (Kan. 1899); Aetna Life Ins. Co. v. McLaughlin, 380 S.W.2d 101, 102 (Tex. 1964). The authorities split, however, when inquiring into whether the "sane or insane" provision applies if the insured could not understand and appreciate the **physical nature and consequences of the self-destructive act** which resulted in his death. The majority view holds that for an act to be "suicide, sane or insane," it is not necessary for the insured to have realized or appreciated the physical nature or consequences of his act, nor did he need to form the conscious purpose to kill himself.[2] As such, intent of the deceased insured is an irrelevant inquiry when precluding death benefits because of suicide. A minority of the states take the view that consciousness of the physical nature and consequences of the act and

---

[2] See, e.g., U.S. Fid. & Guar. Co. v. Blum, 258 F. 897 (9th Cir. 1919); Ann Arbor Trust Co. v. North American Co. for Life & Health Ins., 383 F. Supp. 310 (E.D. Mich. 1974), aff'd, remanded on other grounds, 527 F.2d 526 (6th Cir. 1975); Seitzinger v. Modern Woodmen of America, 204 Ill. 58, 68 N.E. 478 (1903); Moore v. Northwestern Mut. Life Ins. Co., 192 Mass. 468, 78 N.E. 488 (1906); Aetna Life Ins. Co. v. McLaughlin, 380 S.W.2d 101 (Tex. 1964); see also Relevance of Insured's Knowledge and Appreciation of Physical Consequences or Nature of Act, 9A Couch on Ins. § 138:38.

an intention by insured to kill himself **are essential**, even in the case of an insane person, to the applicability of a suicide clause with the words "sane or insane."[3] As such, under this view, total incapacity of the mind and the inability to form such an intention prevents the application of such a provision. The difference in reasoning between these divergent camps is essentially that the minority of courts interpret the clause as requiring the technical interpretation of suicide, where the act causing the death of the insured must be a voluntary act by one capable of exercising his will, regardless of the "sane or insane" modifier, and the majority interprets the modifier to mean just what those words commonly import, that is, if death ensues from any physical movement of the hand or body of the insured proceeding from a partial or total eclipse of the mind, the insurer may go free. See Blum, 258 F. at 900; Johnson v. Metropolitan Life Ins. Co., 273 F. Supp. 589, 593 (N.J. 1967). The majority views the plain language of the clause and reasons that because no additional words having a more technical meaning were inserted into the contract, the parties must have intended to cover every case of suicide and to not attempt to measure the degrees of insanity. See Blum, 258 F. at 901; Moore, 192 Mass. 468, 472-73.

The Puerto Rico Supreme Court has never weighed in on this discussion. Although Defendants argue that there is clear First Circuit precedent on this issue, the court finds those cases distinguishable from the present case for the following reasons. First, those cases are guided by the principles of the federal common law of the Employee Retirement Income Security Act, which is not implicated in the present case. See, e.g., Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 88 (1st

---

[3] See, e.g., Searle v. Allstate Life Ins. Co., 38 Cal. 3d 425 (1985); Christensen v. New England Mut. Life Ins. Co., 197 Ga. 807 (1944); Muzenich v. Grand Carniolian Slovenian Catholic Union, 154 Kan. 537 (1941); Columbian Nat'l Life Ins. Co. v. Wood, 193 Ky. 395 (1921); Mauch v. Supreme Tribe of Ben Hur, 184 N.Y. 527 (1906); Ladwig v. National Guardian Life Ins. Co., 211 Wis. 56 (1933); see also Relevance of Insured's Knowledge and Appreciation of Physical Consequences or Nature of Act, 9A Couch on Ins. § 138:38.

Cir. 2008); Wickman v. Nw. Nat. Ins. Co., 908 F.2d 1077, 1081-82 (1st Cir. 1990). Second, the inquiry in those cases involved formulating an approach for interpreting the term "accident" in Accident Death and Dismemberment life insurance policies to determine whether a particular death was an accident, as opposed to an inquiry into whether an insured intentionally killed himself. See Stamp, 531 F.3d at 88-94; Wickman, 908 F.2d at 1084-89. Indeed, in Stamp, the court contrasted its inquiry into the term "accident" from an inquiry into whether an insured intentionally killed himself after he had signed a policy with an exclusion for self-inflicted injury. See Stamp, 531 F.3d at 92 n.12. Plaintiffs recognize that the resolution of this issue rests upon an interpretation of Puerto Rico law, but due to the lack of Puerto Rico precedent, Plaintiffs rely upon numerous state court decisions across the country that have favorable holdings to their position—those being the minority rule discussed above.[4]

Despite having never addressing this exact issue, the Puerto Rico Supreme Court has addressed the issue of whether it is proper to examine, for the purpose of imposing liability in damages in the tort context, whether a mentally incompetent person that assaulted and killed another person was capable of understanding what he was doing and thus whether he could have acted on his own free will to be "chargeable" with civil liability. See Laureano Perez v. Soto, 141 D.P.R. 77, 1996 P.R. Offic. Trans. 499 (1996). In Soto, the court held "that for a mentally incompetent person who has caused harm to another person to be deemed non-chargeable, his

---

[4] One United States District Court Judge in this District briefly addressed a "suicide, sane or insane" clause and noted that even though exclusion clauses should be strictly construed, they will be enforced if the language is explicit and there is no room for interpretation which would run contrary to the obligations under the contract, such a clause is clear and unambiguous. Moeller Tevez, 534 F. Supp. 2d at 258. Thus, the opinion seems to suggest that the court followed the majority rule in construing the contract language by the rules of plain interpretation to exempt insurers from all liability with respect to any suicide. However, plaintiffs in that case disputed that the insured died by his own hand and thus argued that he did not kill himself—a crucial distinction from this case. Id.

mental incapacity must be total at the time of the events; in other words, his incapacity at the time of the events must be of such nature so as to totally deprive him of his capacity to understand what he was doing." Id. In holding as such, the court reasoned that "[i]ndividuals cannot be divided into 'sane' and 'insane.' Most individuals are halfway between these extremes," and thus when mental capacity is disputed in this context, the courts cannot reasonably resolve the issue without the help of experts. Id. Even though the Puerto Rico Supreme Court recognized the need to inquire into the mental capacity of a tort defendant for imposing civil liability, whether the court would apply this reasoning to the case at bar is unclear. The question in Soto involved an inquiry into a person's mental capacity as a matter of law in the tort context and thus the question of the person's intent is highly relevant for purposes of liability. In the present case, the inquiry involves an examination into what the parties intended when entering into the insurance contract: is the intent of the insured at the moment he killed himself relevant? As such, the question seems to involve less a technical inquiry into the definitions of suicide and sanity and involve more principles of Puerto Rico contract law. See, e.g., P.R. LAWS ANN. tit 31 §§ 3471-3478. However, an application of these principles by this court without any guidance by the Puerto Rico Supreme Court—perhaps addressing its policy concerns about the issue of suicide—does not properly resolve this issue.

Based on the foregoing precedent and discussion, this court finds itself in the position of being asked to resolve an important issue of Commonwealth law, that to date has been unanswered by the Puerto Rico Supreme Court. This federal court believes, based on the principles of federalism and comity between Puerto Rico's federal and state forums, the most respectful course

of action is to certify this question to the Honorable Justices of the Puerto Rico Supreme Court. It is for these reasons the court certifies the following question to the Puerto Rico Supreme Court:

> **Does a clause excluding "suicide, sane or insane" apply with or without regard to whether the insured could understand and appreciate the physical nature and consequences of the act which resulted in his death?**

## IV. Principles of Comity and Federalism

The idea of comity[5] between local and federal courts is not a trifling concept. Comity is "'neither a matter of absolute obligation, on the one hand, nor a mere courtesy and good will, upon the other.'" See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 409 (1964) (quoting Hilton v. Guyot, 159 U.S. 113, 163-64 (1895)). The mutual respect between state and federal courts affords the participants a timely resolution of matters and a sense of finality. See Martínez v. Ryan, 132 S. Ct. 1309, 1316 (2012). Federalism simply describes the "legal relationship and distribution of power between" the federal and state governments, but recent jurisprudence seems to expand the working definition of federalism to incorporate "cooperative federalism."[6] BLACK'S LAW DICTIONARY 687 (9th ed. 2009); see Cullen v. Pinholster, 131 S. Ct. 1388, 1401 (2011) (explaining virtues of "comity, finality, and federalism" in the habeas corpus context). Together, these principles guide the court when tasked to interpret new areas of local law.

Rather than boldly asserting itself as the ultimate authority of local law, a federal court should afford the local judiciary the opportunity to be the first to rule on the legality or constitutionality of local law. See Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 40

[5] Comity is defined as the practice among political entities (as nations, states, or courts of different jurisdictions), involving especially mutual recognition of legislative, executive, and judicial acts. BLACK'S LAW DICTIONARY 303-04 (9th ed. 2009).

[6] Cooperative federalism is defined as the distribution of power between the federal government and the states in which each recognizes the powers of the other while jointly engaging in certain governmental functions. BLACK'S LAW DICTIONARY 687 (9th ed. 2009).

F.3d 18, 24 (1st Cir. 1994). This can be achieved by invoking abstention doctrines or by certification. See Sullivan v. City of Augusta, 511 F.3d 16, 44 (1st Cir. 2007). The certification mechanism is widely applauded as increasing the likelihood of a federal court answering the substantive question correctly and demonstrating a federal court's respect for the state court. See Rebecca Hollander-Blumoff, The Psychology of Procedural Justice in the Federal Courts, 63 HASTINGS L.J. 127, 169 (2011) (stating benefits of certification are "getting the legal question substantively correct[,] . . . not creating contrasting precedent [between the state and federal courts, and] . . . signals respect and deference to the state court system's capabilities to determine its own state law"); Examining the Power of Federal Courts to Certify Questions of State Law, 88 CORNELL L. REV. 1672, 1697 (2003) ("[C]ertification offers a federalism benefit to federal courts. Insofar as it allows a state court to determine pertinent issues of state law, certification spares a federal court the difficult chore of determining state law."). It is with the utmost respect for the Puerto Rico Supreme Court that the court submits this question.

## V. Conclusion

The Clerk of Court shall transmit this certification to the Clerk of the Puerto Rico Supreme Court pursuant to P.R. LAWS ANN. tit. 4, app. XXI-A, 25.

**SO ORDERED.**

In San Juan, Puerto Rico this 20th day of February, 2015.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge